UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMALGAMATED BANK, as Trustee for THE LONGVIEW COLLECTIVE INVESTMENT FUND, Derivatively on Behalf of AMERISOURCEBERGEN CORPORATION, | ) ) ) ) ) | Civ. Action No. |
| Plaintiff, | ) ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND USURPATION OF CORPORATE OPPORTUNITY |
| vs. | ) ) ) | |
| R. DAVID YOST, ROBERT E. MARTINI, RODNEY H. BRADY, CHARLES H. COTROS, RICHARD C. GOZON, EDWARD E. HAGENLOCKER, JANE E. HENNEY, JAMES R. MELLOR, FRANCIS G. RODGERS, J. LAWRENCE WILSON, STEVEN H. COLLIS, CHARLES J. CARPENTER and NEIL F. DIMICK, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| AMERISOURCEBERGEN CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) ) | DEMAND FOR JURY TRIAL |

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2004 by William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP. William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP is prohibited.

## INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of the AmerisourceBergen Corporation ("Amerisource" or the "Company") for violations of applicable law, including breach of fiduciary duty and waste of corporate assets, against Amerisource's entire Board of Directors and certain current and former key executive officers (collectively, "defendants").

2.      Amerisource is a wholesale distributor of pharmaceutical products and related healthcare services.  Amerisource does not manufacture the pharmaceutical products it sells. Instead, Amerisource sells pharmaceutical products it acquires to a wide variety of doctors, hospitals and pharmacies, as the drug manufacturers themselves typically only sell directly to the largest hospitals and organizations.  Amerisource, along with wholesalers McKesson and Cardinal Health, collectively handle about 90% of the U.S. wholesale drug market.   Until recently, Amerisource was the nation's largest drug wholesaler and Amerisource's largest client was the Veterans Administration ("VA"), which contributed about 7% of Amerisource's fiscal 2003 revenue.

3.      During the last decade, the Company and its predecessors have been investigated repeatedly, and prosecuted numerous times for violations of state and federal law for overbilling private and government patients, Medicaid and Medicare fraud, and for recycling and reselling previously dispensed drugs from nursing homes.  The Company was forced to pay substantial fines and penalties, putting the Amerisource Board of Directors on clear notice that Amerisource's very future depended upon its compliance with the nation's state and federal laws.

4.      Despite this, between 1999 and the present (the "Relevant Period"), defendants have still permitted the Company to be subjected to massive exposure for civil and criminal liability to its healthcare consumers who received tainted and/or altered prescription drugs the Company purchased from smaller wholesalers in the so-called "grey market" of the wholesale drug industry.

According to a recent detailed report following the investigations of a Florida grand jury, many of these secondary wholesalers operating in the grey market are rogue operators with small, shoddy shops selling medically sensitive drugs, often stolen, mishandled, smuggled from overseas and/or illegally and dangerously recycled.  Investigators found that some of the drugs Amerisource procured from the secondary wholesalers of the grey market – at substantial discounts *vis-a-vis* the price it would pay to buy directly from the manufacturers – had as little as 5% strength but had been fraudulently relabeled as full-strength.

5.     The wholesale drug industry is run at high volumes with razor-thin 1% profit margins.  If a large wholesaler like Amerisource can purchase drugs for less than the manufacturer's price in the grey market, the spread goes straight to its bottom line, making the Company appear more profitable in the short-run – but resulting in tremendous potential liability for the Company.  Defendants admit that Amerisource's executive compensation is "based primarily on achieving both financial performance objectives and strategic and operating objectives, with greater weight given to the financial performance objectives," which has created a perverse incentive to increase the Company's bottom-line results at all costs.  As a result, defendants have caused Amerisource to purchase a substantial amount of drugs from the secondary market in the past several years and have exposed the Company to unjustifiable levels of regulatory scrutiny and criminal and civil liability.

6.     Amerisource is also currently being investigated for fraud and money laundering in connection with its drug transactions with the secondary market.  By selling unneeded drugs to institutional pharmacies (which receive deep discounts), who in turn sell the same drugs into the secondary market, where Amerisource is alleged to repurchase the drugs, sometimes completing

this cycle more than once, Amerisource is claimed to have fraudulently obtained millions of dollars of unearned rebates.[1]

7.     In 1999, federal prosecutors in Las Vegas began targeting Amerisource as part of a broad investigation of illegal drug diversion in the Southwest.  The FBI set up an undercover business in Las Vegas.  In seven months, the undercover business bought $31.2 million worth of deeply discounted drugs meant for hospices and nursing homes from the Sacramento division of Amerisource.  The drugs were quickly diverted to other smaller wholesalers, earning nearly $1 million in profit.  In July 2003, the U.S. Attorney in Sacramento charged Robert Strusz ("Strusz"), a former sales manager at Amerisource's distribution center in Sacramento, with mail fraud.  Strusz pleaded guilty in September 2003 to one federal criminal count of mail fraud in exchange for his promise to assist with the investigation and prosecution of Amerisource.  Strusz has admitted that in addition to the kickbacks he received, *he received bonuses from Amerisource as a result of the illegal sales*.  Thereafter, the Company's Chairman and Chief Executive Officer acknowledged that defendants were contacted by federal officials concerning the sting operation in 2001, but, despite the tremendous potential liability Amerisource faces, concealed the investigation for a two-and-a-half-year period between February 2001 and September 18, 2003, when Strusz's conviction became public knowledge.

8.     As a result of Amerisource's misconduct at defendants' hands, on December 31, 2003, the VA shocked the investment community by announcing that it was stripping Amerisource

---

[1]          According to the "Profile of the Prescription Drug Wholesaling Industry – Examination of Entities Defining Supply and Demand in Drug Distribution – Final Report " published by the FDA in 2001, a "Rebate" is the "amount that the manufacturer of the drug pays to an insurer or health plan for each unit of drug dispensed.  Rebate arrangements exist between drug manufacturers and Medicaid agencies, HMOs, and other insurers or drug plans, and generally bypass the pharmacy.  Rebates are also referred to as 'after market' arrangements because they do not affect the prices paid at the time of service, but are implemented later, ultimately reducing the payer's expenditures or program costs."

of its $25 billion, eight-year VA contract for primary distribution of pharmaceutical products. The VA instead awarded the contract to competitor McKesson, even though switching vendors will cost the VA substantial extra-transactional costs because the VA currently uses Amerisource's proprietary vending software to place and track orders. The VA contract contributed more that $3.3 billion, or about 7%, to Amerisource's fiscal 2003 revenue and the VA was Amerisource's largest customer, which had made Amerisource the largest pharmaceuticals wholesaler.

9.     The VA contract came up for renewal in the Fall of 2003, at the same time the news of Amerisource's involvement in the counterfeit drug operations and complicity in the money-laundering schemes broke. Up until the fateful December 31st announcement that the Company had lost the contract, defendants repeatedly attempted to dispel fears in the investment community about the Company's ability to retain the VA contract. For example, in a December 4, 2003 press conference, defendant R. David Yost stated that "we continue to be very optimistic that our experience with the VA, which now goes back almost two decades, and our service level, will serve us well within the award of that contract." In their press conference on December 31, 2003, defendants conceded that the VA contract loss would have a disproportionately large impact on the Company's earnings and that Amerisource would cut its fiscal 2004 earnings forecast by approximately 10%. The situation is made worse by the fact that the VA account still needs to be serviced through March 31, 2004, and related costs cannot be immediately eliminated. As a result, several analysts lowered their ratings on Amerisource immediately following the announcements.

10.     Between February 2001 and September 18, 2003, while defendants kept their involvement with the misconduct and the related investigation secret, the Company's stock traded up from between $48 and $55 per share in February 2001 to over $82 a share in mid-2002. When the news of the Company's former sales manager's conviction was revealed on September 19,

2003, and defendants admitted their knowledge of the underlying allegations all the way back to 2001, the Company's stock price fell to below $54 per share on extremely heavy trading volume. Meanwhile, several Company insiders, including the Company's two founders who currently serve as its Chief Executive Officer and as Chairman took advantage of the Company's inflated stock price and obtained over $35.5 million in proceeds on the sale of stock while in possession of material, non-public proprietary information.  As a result, Amerisource has been exposed to potential liability for violations of state and federal securities laws and the Company's reputation for candor in the business community has been tarnished, contributing to the loss of the VA contract.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332, because complete diversity exists between plaintiff and each defendant, and the amount in controversy exceeds the jurisdictional minimum of this Court.

12.     Venue is proper in this District because Amerisource has its principal place of business in this District.  Plaintiff's cause of action arose in this District and Amerisource has suffered and will continue to suffer harm in this District.  Moreover, each defendant has extensive contact with Pennsylvania, including defendants Yost and Wilson, who reside in this District.

## THE PARTIES

13.     Plaintiff is and has been at all relevant times the owner of Amerisource common stock.  Plaintiff is a citizen of New York.

14.     Nominal Defendant Amerisource is a wholesale distributor of pharmaceutical products and related healthcare services and solutions.  Amerisource is organized under the laws of Delaware.  Amerisource's executive offices are located at 1300 Morris Drive, Suite 100, Chesterbrook, Pennsylvania.

15.     Defendant Robert E. Martini ("Martini") is, and was during the Relevant Period, the Chairman of the Board of Directors of Amerisource and a member of its Executive Committee. Martini founded the Bergen Brunswig Corporation ("Bergen") and served as its Chairman and CEO prior to its merger with Amerisource Healthcare Corporation ("AHC") in 2001 which formed Amerisource.  Martini is a citizen of Nevada.  Martini has repeatedly caused corporations under his control to violate applicable laws and regulations resulting in Martini being named as a defendant in securities fraud class actions and shareholder derivative suits brought against Bergen in 1999 and 2000 in connection with Bergen's failure to release information concerning an investigation by the Department of Health and Human Services against one of the Company's subsidiaries and as such was subject to a heightened sense of duty not to violate the federal securities laws or any of his fiduciary duties to the Company.  Nonetheless, between February 2001 and September 2003, Martini sold 124,395 shares of Amerisource stock at inflated prices for almost $9.5 million in proceeds while in possession of material, non-public information.  While serving as CEO of Bergen prior to the merger, Martini and his son Brent Martini received substantial loans which were forgiven in connection with the 2001 Amerisource merger.  Between 2000 and 2002, Martini's son, Brent Martini, also received the following salaries and incentive compensation based on Amerisource's financial results, obtained in part by purchasing counterfeit drugs in the grey market:

| Year | Base Salary | Bonus | Forgiven Loan Interest | Stock Options |
|------|-------------|-------|------------------------|---------------|
| 2002 | $400,000 | $300,000 | – | 35,000 |
| 2001 | $375,000 | $230,000 | $63,261 | 42,647 |
| 2000 | $325,000 | $124,400 | – | 64,749 |

By virtue of his current and past positions with the Company, his insider trading, his other personal participation in the wrongful conduct alleged in this complaint, and his and his son's extensive

business ties with other Amerisource directors, Martini is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

16.     Defendant R. David Yost ("Yost") is, and was during the Relevant Period, a director of Amerisource, its Chief Executive Officer ("CEO") and a member of its Executive Committee. Prior to the merger, Yost served as a director, the chairman of the board, CEO and president of AHC.  Yost is a citizen of Pennsylvania.  As a director of Amerisource, Yost owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Yost owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties. Between February 2001 and September 2003, Yost sold 28,000 shares of Amerisource stock for over $1.8 million in proceeds while in possession of material, non-public information.  Between 2000 and 2003, Yost also received the following salaries and incentive compensation based on Amerisource's financial results, obtained in part by purchasing counterfeit drugs in the grey market:

| Year | Base Salary | Bonus | Stock Options |
|------|-------------|-------|---------------|
| 2003 | $960,350 | $995,000 | 100,000 |
| 2002 | $666,473 | $694,700 | 100,000 |
| 2001 | $563,942 | $642,250 | 180,000 |
| 2000 | $525,000 | $592,250 | 75,000 |

By virtue of his current and past positions with the Company, his insider trading, his other personal participation in the wrongful conduct alleged in this complaint, and his extensive business ties with other Amerisource directors, Yost is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

17.     Defendant Rodney H. Brady ("Brady") is, and was during the Relevant Period, a director of Amerisource.  Brady served as a director of Bergen from 1973 until its merger with AHC to form Amerisource in 2001.  Brady is a citizen of Utah.  As a director of Amerisource, Brady owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Brady owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties.  In 1972, Brady originally joined Bergen (Amerisource's predecessor) as an Executive Vice President of Pharmaceuticals where he served under Martini. Brady was named as a defendant in securities fraud class actions and shareholder derivative suits brought against Bergen in 1999 and 2000 concerning its non-disclosure of a Health and Human Services investigation of one of its subsidiaries and as such was subject to a heightened sense of duty not to violate the federal securities laws or any of his fiduciary duties to the Company. Nonetheless, between February 2001 and September 2003, Brady sold 11,942 shares of

- 8 -

Amerisource stock at inflated prices while in possession of material, non-public information, receiving over $881,000 in proceeds. By virtue of his current and past executive positions with the Company, his insider trading, his personal participation in the wrongful conduct alleged in this complaint, including his failure to oversee the Company's operations, and his extensive and long-term personal, financial and professional relationships with the Amerisource Board and management, Brady is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

18.     Defendant Charles H. Cotros ("Cotros") is, and was during the Relevant Period, a director of Amerisource. Cotros was appointed to the Amerisource Board by Yost and Martini after the merger and serves at their behest. Cotros is a citizen of Texas. As a director of Amerisource, Cotros owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Rather than fulfill these important fiduciary duties Cotros owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties. As a member of the Company's Audit and Corporate Responsibility Committee, according to the Company's annual proxy statement, Cotros was charged with assuring the "quality, not just the acceptability" of the Company's financial statements which did not disclose the Company's exposure to the investigation into its alleged fraud and money laundering in connection with the drug sales rebates. Cotros also signed the potentially false and misleading fiscal 2002 10-K. By virtue of his position with the Company, his personal participation in the wrongful conduct alleged in this complaint, including his failure to oversee the Company's operations, and his relationships with the Amerisource Board, Cotros is not

independent and is not disinterested and could not have appropriately considered a shareholder demand.

19.     Defendant Richard C. Gozon ("Gozon") is, and was during the Relevant Period, a director of Amerisource.  Gozon served as a director of AHC from 1994 through the 2001 Amerisource merger.  Gozon is a citizen of Florida.  As a director of Amerisource, Gozon owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Gozon owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties.  AHC was founded in 1977 as Alco Health Services, a division of the Alco Standard Corporation.  AHC was spun-off from Alco Standard in 1988.  Gozon served as president, chief operating officer and a director of Alco Standard from 1972 to 1994.  Gozon then served from 1994 through the 2001 Amerisource merger as a director of AHC.  Gozon has also continued to serve as a director of the Triumph Group since it was spun off from Alco Standard in 1993 and Triumph's offices are still located right next to Amerisource's in Chesterbrook, PA.  As a member of the Company's Audit and Corporate Responsibility Committee, according to the Company's annual proxy statement, Gozon was charged with assuring the "quality, not just the acceptability" of the Company's financial statements which for over two years did not disclose the Company's exposure to the investigation into its alleged fraud and money laundering in connection with the drug sales rebates.  Gozon also signed the potentially false and misleading fiscal 2001 and 2002 10-Ks.  By virtue of his current and past executive positions with the Company, his personal participation in the wrongful conduct alleged in this complaint, including his failure to oversee the

Company's operations, and his extensive and long-term personal, financial and professional relationships with the Amerisource Board and management, Gozon is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

20.     Defendant Edward E. Hagenlocker ("Hagenlocker") is, and was during the Relevant Period, a director of Amerisource.  Hagenlocker previously served as a director of AHC from 1999 until the 2001 Amerisource merger. Hagenlocker is a citizen of Michigan.  As a director of Amerisource, Hagenlocker owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Hagenlocker owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties.  Hagenlocker sold 8,000 shares of Amerisource stock at inflated prices between February 2001 and September 2003 while in possession of material, non-public information for proceeds of $606,400.  Hagenlocker serves on the Air Products & Chemicals board of directors along with Ursula F. Fairbairn who held several marketing and human resources positions at IBM where defendant Francis G. Rodgers served as vice president of marketing.   As the Chairman of the Company's Audit and Corporate Responsibility Committee, according to the Company's annual proxy statement, Hagenlocker was charged with assuring the "quality, not just the acceptability" of the Company's financial statements which for over two years did not disclose the Company's exposure to the investigation into its alleged fraud and money laundering in connection with the drug sales rebates.  Hagenlocker also signed the potentially false and misleading fiscal 2001 and 2002 10-Ks.  By virtue of his position with the Company, his insider trading, his personal participation in the wrongful conduct

alleged in this complaint, including his failure to oversee the Company's operations, and his relationships with the Amerisource Board, Hagenlocker is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

21.     Defendant James R. Mellor ("Mellor") is, and was during the Relevant Period, a director of Amerisource.  Mellor is a citizen of California.  Mellor served as a director of Bergen from 1979 until its 2001 merger with AHC to form Amerisource.  As a director of Amerisource, Mellor owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Mellor owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties.  Mellor was named as a defendant in securities fraud class actions and shareholder derivative suits brought against Bergen in 1999 and 2000 concerning its non-disclosure of an investigation by the Department of Health and Human Services concerning one of its subsidiaries and as such was subject to a heightened sense of duty not to violate the federal securities laws or any of his fiduciary duties to the Company.  By virtue of his position with the Company, his personal participation in the wrongful conduct alleged in this complaint, including his failure to oversee the Company's operations, and his relationships with the Amerisource Board, Mellor is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

22.     Defendant Francis ("Buck") G. Rodgers ("Rodgers") is, and was during the Relevant Period, a director of Amerisource.  Rodgers is a citizen of Connecticut.  Rodgers served as a director of Bergen from 1982 until its 2001 merger with AHC to form Amerisource.  As a director

of Amerisource, Rodgers owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Rodgers owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties.  Rodgers was named as a defendant in securities fraud class actions and shareholder derivative suits brought against Bergen in 1999 and 2000 concerning its non-disclosure of a pending Health and Human Services Department investigation and as such was subject to a heightened sense of duty not to violate the federal securities laws or any of his fiduciary duties to the Company.  Nonetheless, between February 2001 and September 2003, Rodgers sold 1,942 shares of Amerisource stock at inflated prices while in possession of material non-public information, receiving over $114,000 in proceeds.  Rodgers served as vice president of sales at IBM for 34 years.  David M. Senior, Amerisource's Vice President of Business Development, was a manager of the Wilkerson Group, a leading healthcare consulting firm, which is now a division of IBM.  In 1997, IBM partnered with Amerisource to develop and implement a turnkey warehouse management system with wireless communications which allows Amerisource's computers to transfer order data to employees on the warehouse floor. Additionally, Ursula F. Fairbairn formerly held several marketing and human resources positions at IBM and currently sits on the Air Products & Chemicals board of directors with defendant Hagenlocker.  As a member of the Company's Audit and Corporate Responsibility Committee, according to the Company's annual proxy statement, Rodgers was charged with assuring the "quality, not just the acceptability" of the Company's financial statements which for over two years did not disclose the Company's exposure to the investigation into its alleged fraud and money

laundering in connection with the drug sales rebates.  Rodgers also signed the potentially false and misleading fiscal 2001 and 2002 10-Ks.  By virtue of his position with the Company, his insider trading, his personal participation in the wrongful conduct alleged in this complaint, including his failure to oversee the Company's operations, and his relationships with the Amerisource Board, Rodgers is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

23.     Defendant J. Lawrence Wilson ("Wilson") is, and was during the Relevant Period, a director of Amerisource.  Wilson served as a director of AHC from 2000 through its 2001 Amerisource merger.  Wilson is a citizen of Pennsylvania.  As a director of Amerisource, Wilson owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary duties Wilson owed to Amerisource and its shareholders, he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating his oversight duties.  By virtue of his position with the Company, his personal participation in the wrongful conduct alleged in this complaint, including his failure to oversee the Company's operations, and his relationships with the Amerisource Board, Wilson is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

24.     Defendant Jane E. Henney ("Henney") is, and was during the Relevant Period, a director of Amerisource.  Henney is a citizen of Ohio.  Henney was appointed to the Amerisource Board by Yost and Martini after the merger and serves at their behest.  As a director of Amerisource, Henney owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Rather than fulfill these important fiduciary

duties Henney owed to Amerisource and its shareholders, she, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached her fiduciary duties to the shareholders of Amerisource by purposefully, recklessly and/or negligently disregarding these wrongful acts and wrongfully abrogating her oversight duties. By virtue of her position with the Company, her personal participation in the wrongful conduct alleged in this complaint, including her failure to oversee the Company's operations, and her relationships with the Amerisource Board, Henney is not independent and is not disinterested and could not have appropriately considered a shareholder demand.

25.     Defendant Steven H. Collis ("Collis") has served as a Senior Vice President of the Company and President of AmerisourceBergen Specialty Group since the 2001 Amerisource Merger.  Prior to the merger, Collis served as Senior Executive Vice President of Bergen from February 2000 until the merger.  Between February 2001 and September 2003, Collis sold in excess of $3.3 million worth of Amerisource stock while in possession of material, non-public internal information.

26.     Defendant Charles J. Carpenter ("Carpenter") served as a Senior Vice President of the Company and President of PharMerica, Inc. from the 2001 Amerisource merger until he suddenly resigned at the end of 2002.  Previously, Carpenter served as President of PharMerica, Inc., from April 1999 until the merger, as Senior Executive Vice President of Bergen from 1996 until the Merger, and as Chief Procurement Officer of Bergen from 1996 to April 1999.  Between February 2001 and September 2003, Carpenter sold in excess of $11.6 million worth of Amerisource stock while in possession of material, non-public internal information.

27.     Defendant Neil F. Dimick ("Dimick") served as Executive Vice President and Chief Financial Officer of the Company from the 2001 Amerisource merger until he suddenly resigned

in March 2002.  Previously, Dimick served as Senior Executive Vice President and Chief Financial Officer of Bergen from 1992 to the merger and was formerly Bergen's Vice President, Finance from 1991 to 1992.  Dimick was also President of Bergen Brunswig Specialty Company from September 1996 to August 2000.  During the Relevant Period, Dimick sold $7.7 million worth of Amerisource stock while in possession of material, non-public internal information.

28.     The defendants named above in ¶¶15-24 comprise the members of the Amerisource Board of Directors at the time of the filing of this complaint and are hereinafter referred to as the "Director Defendants."  The defendants named above in ¶¶16-17, 20, 22 and 25-27 sold stock while in possession of material, non-public proprietary information and are referred to herein as the "Selling Defendants."   As officers and/or directors of the Company, the defendants named herein at ¶¶15-27 (referred to collectively as the "Individual Defendants"), owed the highest fiduciary duties of good faith, loyalty, fair dealing, due care and candor to Amerisource.

## DEFENDANTS' FIDUCIARY DUTIES

29.     Each officer and director of Amerisource owed the Company and its public shareholders the duty to exercise a high degree of due care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Amerisource's directors complained of herein involves a knowing and culpable violation of their obligations as directors of Amerisource, a blatant breach of the duty of loyalty, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the directors were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of Amerisource's directors and officers who caused Amerisource to pay them undue remuneration, to subvert Amerisource's interests and to expose the Company to millions of dollars in damages, fines and criminal sanctions has been ratified by Amerisource's Board, which has failed to take any action on behalf of the Company against them.

30.     In contrast to the actions taken by defendants and certain Company insiders, as alleged herein, by reason of their positions as officers, directors and/or fiduciaries of Amerisource and because of their ability to control the business and corporate affairs of Amerisource, the Director Defendants owed Amerisource and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Amerisource in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Amerisource and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31.     Each director and officer of the Company owes to Amerisource the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair

dealing.  To discharge their duties, the officers and directors of Amerisource were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of Amerisource.  By virtue of such duties, the officers and directors of Amerisource were required, among other things, to:

(a)     Manage, conduct, supervise and direct the business affairs of Amerisource in accordance with state and federal law, state and federal rules and regulations and the charter and bylaws of Amerisource;

(b)     Neither violate nor knowingly permit any officer, director or employee of Amerisource to violate applicable federal laws, rules and regulations and state law;

(c)     Remain informed as to the status of Amerisource's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and affairs of Amerisource and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial and accounting controls, such that Amerisource's financial statements and information would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)     Cause Amerisource to comply with all applicable federal and state property laws and to preserve and protect Amerisource's assets.

## BACKGROUND

32.     Amerisource was created in August of 2001 following the merger of AHC and Bergen, then the country's fourth and third largest pharmaceutical services companies.

33.     AHC was founded in 1977 and beginning with the purchase of The Drug House in 1977 embarked upon a series of acquisitions to build its wholesaling presence.  By the early 1980s, AHC (then known as Alco Health Services), was the third largest wholesale drug distributor in the United States.  Through strategic acquisitions and expanded product lines, AHC grew and conducted an initial public stock offering in 1995.  In 1998 the Federal Trade Commission blocked the acquisition of AHC by McKesson Corporation, then the largest U.S. drug company.  By 2000, AHC, with 22 distribution centers and nearly $14 billion in operating revenue, was the fourth largest U.S. distributor of pharmaceuticals and related healthcare products and solutions.

34.     Bergen was also built on mergers and acquisitions.  Founded by Lucien Napoleon Brunswig in 1907, the Brunswig Drug Company merged with Bergen Drug in 1969, a firm founded by Emil Martini in 1947.  Bergen, which had grown through acquisitions from sales of $200,000 per sales person to $1.6 million per sales person between 1975 and 1989, conducted its initial public stock offering in 1989. Bergen continued to increase its holdings by acquiring businesses in the healthcare distribution sector, such as pharmacy giant PharMerica.  By 2000, Bergen was the third largest U.S. distributor of pharmaceuticals and related healthcare products and solutions.

35.     The merger of AHC and Bergen on August 19, 2001 was billed as a "merger of equals" and created Amerisource with approximately $40 billion in annualized operating revenue, making it the nation's largest wholesale distributor of pharmaceutical products and related healthcare services.  The Company operates in two segments: Pharmaceutical Distribution, which is primarily its wholesale and specialty drug distribution segment (including pharmaceuticals, proprietary medicines, cosmetics, toiletries, personal health products, sundries and home healthcare

supplies and equipment); and PharMerica, its institutional pharmacy business (providing pharmacy services to acute care hospitals and health systems, independent retail pharmacies, alternate site customers and national and regional retail pharmacy chains).

36.     Until quite recently Amerisource was the largest drug wholesaler, followed closely by McKesson and Cardinal Health.  However, Amerisource just lost its largest customer, the U.S. Veteran's Administration, which would have provided a $25 million contract defendants were counting on maintaining.  Now McKesson, which already had the Department of Defense contract, is likely to move into the first place slot.

**THE COMPANY'S ENTRENCHED BOARD OF DIRECTORS**

37.     Amerisource's Board is heavily entrenched with the result that its members have consistently abrogated their duties to oversee the conduct of the Company's management, causing disastrous results.  Compared to the typical U.S. company director who is 59 years old and has served on a company's board for an average of 8.5 years (according an October 27, 2003 article in *The Wall Street Journal*), the eight members of the ten-member Amerisource Board who came over from AHC's and Bergen's pre-merger boards are an average of 68 years old, have been with Amerisource on average over 20 years and have collectively served over 164 years:

(a)     Defendant Yost, age 56, Amerisource's President and CEO, has served as a director of AHC since 1997 and held a variety of executive positions with AHC since 1974, including serving as its Chairman, President, CEO, and Executive Vice President of Operations.  ***As such, Yost has been with Amerisource 30 years.***

(b)     Defendant Martini, age 71, who was a co-founder of and served as a director of Bergen since 1962, and as its Chairman, President and CEO, has now ***served as a director for 41 years.***

(c)      Defendant Brady, age 70, who served as a director of Bergen since 1973, has now **served as a director for 30 years.**

(d)      Defendant Gozon, age 65, who served as a director of AHC since 1994, has now served as a director for 9 years.

(e)      Defendant Mellor, age 73, who served as a director of Bergen since 1979, has now **served as a director for 24 years.**

(f)      Defendant Wilson, age 67, has served as a director of Amerisource since 2000.

(g)      Defendant Hagenlocker, age 64, has served as a director of AHC since 1999.

(h)      Defendant Rodgers, age 77, who has served as a director of Bergen since 1982, has now **served as a director for 21 years.**

38.      In fact, the Company's 2001 merger was contingent upon these eight directors being permitted to retain their lucrative positions as directors of this publicly traded company.  The only two new Board members who joined Amerisource after the merger were 66 year-old defendant Cotros, the retired Chairman and Chief Executive Officer of Sysco, and 56 year-old defendant Henney, a Senior Scholar in Residence at the Association of Academic Health Centers, both of whom were appointed to the Board in January 2002 in connection with the Amerisource merger. Because Amerisource, unlike almost every U.S. corporation, had no nominating committee, both Cotros and Henney were hand-selected and appointed by Yost and Martini who have dominated and controlled them and to whose views Cotros and Henney have continued to defer to.

39.      This entrenchment of Amerisource's Board has permitted all of the Company's directors to abrogate their authority and oversight to Yost, Martini and their cronies.  Defendants Yost, Martini, Mellor and Wilson comprised the Board's Executive Committee which had all of the powers and exercised all of the authority of Amerisource's Board in between board meetings

during the Relevant Period.  The Amerisource Board met only 5 times in 2002 and 2003, so Yost and Martini effectively had no Board oversight the other 359 days of those years.

40.     As a result of the board's entrenchment, Yost and Martini were permitted to use their domination and control over Amerisource to plunder Amerisource's assets, despite the Company's public ownership.  Yost has received compensation well in excess of $1 million for each of the past four years and each non-employee director received an unheard of stipend of $50,000 per year, plus several thousand dollars for each Board or Board committee meeting actually attended and over 5,000 stock options per year.  Additionally, prior to the merger, the Bergen board adopted, purportedly to incentivize its executives to stay with Bergen, (i) an "employee loan program" through which Bergen officers received substantial loans which were then forgiven, (ii) another executive loan program through which several Bergen officers who reported to Martini could borrow – interest free – up to 50% of their annual salary, and (iii) a so-called "management stock accumulation" plan, through which Bergen's officers could borrow up to three times their annual salary which could then be forgiven via credits awarded by the Bergen Compensation Committee based on "specified performance goals" they and Martini established. Defendant Martini and his son Brent Martini received substantial loans under these programs and at least $1.4 million of defendant Martini's loans were subsequently forgiven.  Moreover, Martini's son, Brent Martini, who served as President of Amerisource until he suddenly "resigned" on September 30, 2002, received over $7 million dollars under a change-in-control provision pursuant to July 27, 2001 letter agreements his father negotiated in connection with the Amerisource merger.

### DEFENDANTS' ONGOING PRACTICES OF CAUSING AMERISOURCE TO BE A RECIDIVIST VIOLATOR

41.     Under the domination and control of Yost and Martini, Amerisource, its predecessors and its subsidiaries have a long history of operating with reckless abandon regarding state and federal laws and the Company and its predecessors have been cited repeatedly for violations of state and federal laws concerning drug packaging, recycling, billing and sales practices that put the Board on notice of the risk occasioned by their perilous course of conduct.

### A.     Drug Packaging Safety Violations

42.     Amerisource has been cited on numerous occasions for improper handling of drugs for sale.  For instance, on November 6, 1996, AHC's President and CEO received a "Warning Letter" from the Federal Drug Administration indicating that during an inspection of its drug repackaging operation at the Company's Columbus, Ohio facility, the FDA "investigator documented serious deviations from the Current Good Manufacturing Practices Regulations (Title 21 *Code of Federal Regulations*, Part 211)."  Specifically, the letter stated that the "deviations":

(a)     caused the Company's "drug products to be adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug and Cosmetic Act";

(b)     caused the Company to fail "to establish adequate procedures for control of labels and labeling to assure no label mix-ups occur. For example: labels and inserts are not maintained under controlled access; inserts are not stored physically separated; approved inserts/outserts are not identified in the master production records; master production records included two different labels as the approved labels; there are no written procedures nor documentation to assure proper inserts/outserts are used and discarded overpack labeling is not rendered unusable before discarding."

(c)    caused the Company to fail to "adequately perform or document training of personnel as required by written standard operating procedures. For example: no training documentation exists for three production personnel or any of the second shift QA personnel and QA training was provided by an employee who had just received the training."

(d)    caused the Company to fail to "adequately clean, document, and verify the adequacy of cleaning of packaging rooms and equipment between production runs. For example: no documentation exists for cleaning or inspection of rooms and equipment for at least nine batches of product and observation of cleanup procedures, on 9/11/96, revealed inappropriate cleanup procedures were being employed."

(e)    caused the Company to fail to "establish written master production and control records for the (overpack-blister pack) packaging lines."

43.    The Company was specifically warned that "Federal agencies are advised of the issuance of all warning letters about drugs and devices so that they may take this information into account when considering the award of contracts," and threatened further regulatory action, including "seizure and/or injunction" if the "deviations" were not promptly corrected.

**B.    Medicare Fraud**

44.    In an action filed by the U.S. Government in June 2000, auditors at the United States Department of Health and Human Services alleged that between 1997 and 1998, certain nursing homes operated by the Company's PharMerica subsidiary in Texas improperly billed Medicare for intravenous pharmaceuticals and related services.  The suit named Sensitive Care, a former chain of thirteen Texas nursing homes, alleging that Sensitive Care filed false claims for Medicare reimbursement.  Sensitive Care has since been shut down, filed for bankruptcy and brought a third-party complaint alleging that PharMerica is liable for any false claims liabilities that may be imposed against Sensitive Care under an indemnification clause contained in the pharmacy services

contracts between PharMerica and the nursing homes Sensitive Care formerly operated.  In early 2003 the Company settled these charges with the government for an undisclosed sum.

### C.      Medicaid Fraud and Prescription Drug Recycling Liability

45.      On February 16, 2000, Hawaiian regulators began investigating PharMerica, a Bergen subsidiary, for Medicaid fraud at a pharmacy operated by PharMerica.  A whistle-blower action was brought by two former employees of the former Bergen subsidiary who said they were instructed to recycle medicines dispensed at nursing homes meant for disposal into bulk-sales bottles.  Criminal investigations ensued.

46.      On January 12, 2001, Bergen settled for $4 million in fines and penalties allegations involving wrongful recycling of prescription drugs and overbilling by PharMerica.  Hawaiian officials said the settlement was the largest ever in the state for medical fraud.  The allegations charged Bergen with overbilling patients in nursing homes for prescriptions that were paid for by the state's Medicaid program.  By splitting a doctor's monthly prescription into three or four different ones, the Company had charged Medicaid multiple dispensing fees of as much as $5 a transaction.

47.      The Hawaiian action also alleged that Bergen retrieved unused pills – those meant for disposal – from nursing homes and illegally and dangerously recycled them into bulk-sales bottles which were again sold by the Company as new pharmaceutical products.  Not only did the practice violate Hawaiian law, which makes it illegal to repackage previously dispensed drugs, but it was extremely dangerous because patients and doctors had no way of knowing the expiration dates of medications that were recycled and repackaged by the Company and the repackaged medicines were not identifiable in the event of a recall by a drug maker or the Food and Drug Administration.

48.     In January 2001, the Hawaii Attorney General's Medicaid-investigations division reached a $4 million settlement with Bergen's PharMerica, which then became part of Amerisource. Two employees pleaded guilty to felony, theft and false-claim charges. Three other employees pleaded guilty to misdemeanor charges that involved deceptive practices.  Further, in June 2003, the Company agreed to pay $30,000 in a settlement with the Hawaii Board of Pharmacy for violating the drug-disposal laws.

49.     In November 2002, two men filed a civil lawsuit in Hawaii against Amerisource on behalf of their relatives for injuries sustained as a result of PharMerica's resale of previously dispensed pharmaceuticals.  One plaintiff, Francis Markham, who's sister lived in a Honolulu nursing home until she died in 1999, complained that he was "horrified when [he] found out about the drug company reselling drugs that had been returned from other patients," because his "sister spent her last days getting medication that may have been sold many times."  On September 17, 2003, Judge Eden Hifo of Hawaii's First Circuit Court ruled that his case could proceed as a class-action suit on behalf of 4,000 injured patients or the families of deceased patients.

50.     The impact of each of these actions, whether criminal, civil or regulatory, was known by the Amerisource Board which was charged with overseeing the Company's operations and had to acquiesce to the final resolution of each action.  Each time one of these actions was resolved, the Board was aware of the underlying misconduct and had a duty to effect and implement programs and policies to guard against future violations of the law but did not do so. As a result, Amerisource has continued to operate in a lawless fashion and has been exposed to further civil, criminal and regulatory actions and damage to its reputation and standing in the business and financial communities it operates in.  This was particularly important to Amerisource because the U.S. Veteran's Administration was the Company's largest customer and, as outlined *supra*, required good corporate citizenship to continue this relationship.

**FRAUDULENT BILLING PRACTICES AND DRUG MISHANDLING
DURING THE RELEVANT PERIOD**

**A.      Distribution of Dangerous Counterfeit Prescription Drugs**

51.      Amerisource does not conduct drug research and manufacturing itself but instead purchases and redistributes drugs from manufacturers to doctors, hospitals and pharmacies. Amerisource is the nation's largest drug distributor, followed by McKesson and Cardinal Health.

52.      A recent Florida Grand Jury report showed that an estimated 46% of prescription drugs sold are distributed directly from manufacturers to hospitals and large pharmacy chains, while 54% are distributed through drug wholesalers such as Amerisource.  Of those drugs that are distributed through drug wholesalers, 90% go to the three largest distributors, Amerisource, Cardinal Health, and McKesson, which together distribute more than $100 billion worth of drugs each year, supplying the nation's hospitals, drugstore chains and mail-order pharmacies.  The other 10% go from manufacturers to smaller wholesalers, known as "secondary wholesalers," in the "grey market," which then sell to pharmacies, clinics, physicians and each other.  Smaller wholesalers also sell to major wholesalers like Amerisource, which buy some of their drugs from the secondary market where medications may be cheaper than buying directly from the manufacturer.

53.      The recent Florida grand jury investigation report also showed that certain secondary wholesalers obtain medications illicitly, buying drugs at a discount from pharmacies or on the black market from Medicaid patients.  These wholesalers sometimes purchase drugs that have been stolen, illegally imported or adulterated.  Often times a version of the drug with a drastically lower level of the active ingredient costs less and these secondary wholesalers, some of whom are convicted criminals, repackage and resell them as the real thing.  Some secondary wholesalers

operate out of homes, strip malls, even storage sheds.  As a result, sensitive drugs, such as those requiring refrigeration, are often mishandled by secondary wholesalers.

54.     Purchases from the secondary market have again enmeshed Amerisource in civil lawsuits and a criminal investigation and likely cost the Company its $25 million Veterans Administration contract.  In 2000, it is alleged that Amerisource bought 52 bottles of counterfeit Retrovir, an HIV medication, from a small Ohio secondary wholesaler.  The bottles were found during a routine inspection in 2001 at Amerisource's Orlando distribution center.  By turning to the smaller wholesaler rather than buying directly from the drug's manufacturer, Amerisource saved about $8 per bottle on a product that costs nearly $300 a bottle, sales records showed.  The Company paid a $50,000 fine in the Orlando case.  In a letter to Florida authorities in connection with paying the fine, defendants cause the Company to state that "due to the volume of product received daily," the Company "is not able to inspect each piece of product that is received."

55.     In November 2001, the FDA reported that Amerisource had distributed counterfeit Neupogen (Filgrastim) which was being recalled.  The Neupogen was labeled as containing "300 mcg/1.0 ml," but was actually packaged with "10/1.0 ml" single use vials per box.  The FDA recall notice stated that the counterfeit Neupogen was distributed in Indiana, Kentucky, Arkansas, Louisiana, Tennessee, Mississippi, Alabama and Missouri but that the "[q]uantity of counterfeit units distributed can not be determined."

56.     Thereafter, it was revealed that half of an $8.5 million purchase of Epogen, an anti-anemia drug identical to Procrit, Amerisource made in the secondary market between April 2001 and May 2002 was actually one-twentieth of its labeled strength.  Amerisource bought and distributed nearly one-third of the 2,082 boxes of Epogen it purchased on the grey market, with a street value of $4,090 each, before investigators discovered the problem and stopped the Company from continuing to sell the counterfeit Epogen.  Those who purchased an used the defective Epogen

suffered pain and injury.  In August 2003, Timothy Fagan, whose 16-year-old son was receiving Epogen following an emergency liver transplant, filed a lawsuit against Amerisource.  The FDA is currently investigating Fagan's allegations.

57.     Florida state inspectors also allege that Amerisource was selling altered Procit, another anti-anemia drug.  One of the secondary wholesalers Amerisource has a contract to purchase from is a company called Breckenridge, owned and operated by Laurence Runsdorf. Adam Runsdorf, the son of Laurence Runsdorf, runs another secondary wholesaler named the Stone Group.  Adam Runsdorf got into the wholesale drug trade by opening the Stone Group in the same building as Breckenridge, his father's operation.  The Stone Group is alleged to have routinely purchased drugs with false paperwork from unlicensed sellers.  Adam Runsdorf is alleged to have then resold the drugs to his father's company, Breckenridge, and the father's firm would then resell the shipments to Amerisource.  While searching another alleged counterfeit drug seller's operation, 37 invoices for Procrit sales from 2001 and 2002 demonstrated that the Stone Group sold $3.8 million worth of Procit to Breckenridge through the Stone Group.  At least one of the shipments had a lot number identified as being 5% strength, but the drug labels had been relabeled as full-strength.  Amerisource subsidiaries in Alabama, Texas and Kentucky that handle cancer drugs allegedly received the shipments.  The shipment's paperwork proved phony, concealing the true source of the drugs, but by the time investigators tracked the sales, the drugs had already gone to and been consumed by patients.

58.     Robert Penezic, who recently left a job as a Florida state prosecutor pursuing counterfeit drug cases, has stated that major distributors like Amerisource might be conned into buying fake drugs once or even twice, but that "'if I'm conned three times, that opens up whether I'm conned, or complicit and looking to save money for my bottom line.'"

**B.      Fraud and Money Laundering Charges in Connection with Drug Rebates**

59.     In September 2003, it was revealed that the Federal Bureau of Investigation ("FBI") and the U.S. Food and Drug Administration ("FDA") are investigating whether the Company used a scheme to collect illegal rebates from drug manufacturers more than once on the same sale and illegally diverted drugs into a secondary market to boost its profits.  According to a September 2003 report in *The Wall Street Journal*, the FDA and FBI are looking at allegations that the Company faked sales of drugs to institutional pharmacies, otherwise known as "closed-door pharmacies," in order to collect rebates from the manufacturers – with full knowledge that these institutional pharmacies were then reselling the pharmaceuticals to secondary wholesalers. Amerisource is then alleged to have bought the same drugs back from the secondary wholesalers and resold them again, often again to closed-door pharmacies.  Each time such a sale to a closed-door pharmacy is made, a rebate (which is actually a charge-back) is received from the drug manufacturer.  Through this process it is suspected that Amerisource obtained double and triple rebates from drug manufacturers who offer deep discounts on sales to institutional pharmacies which pay set prices based on Medicare and Medicaid schedules.

60.     As typified in the following chart created by the FDA in its "Profile of the Prescription Drug Wholesaling Industry - Examination of Entities Defining Supply and Demand in Drug Distribution - Final Report," published in 2001, the prices paid for drugs are specific to the purchaser.  By gaming the drug distribution system, defendants exposed Amerisource to millions of dollars in potential criminal, civil and regulatory fines and penalties and damage to its reputation and goodwill.

| Table 2-2 An Illustrative Example of Pricing for a Brand Name Prescription Drug | | | | | |
|---|---|---|---|---|---|
| Data Element | Cash Customers (No 3rd Party Payment at Point of Sale) | Insurers and PBMs | HMOs | Medicaid | Federal Supply Schedule |
| List Price (AWP) | $50 | $50 | $50 | $50 | $50 |

| Manufacturer's price *(Manufacturer to wholesaler other entity)* | $40 (AWP - 20%) | $40 (AWP - 20%) | $34 (AWP - 33%) | $40 | $24 (AWP - 52%) |
|---|---|---|---|---|---|
| Acquisition price *(Wholesaler to pharmacy)* | $41 | $41 | NA | $41 | NA |
| Retail price at pharmacy *(Total of amounts paid by customer and reimbursed by 3rd party payer)* | $52 (AWP + 4%) | $46 [b] (AWP - 13% + $2.50) | NA | $43.50 ($41 + $2.50) | NA |
| Retail price, less typical manufacturer rebate | NA | $30 to $44 (5% to 35% rebate) | NA | $30 to $37 (15.1% to 30% rebate) | NA |
| Ultimate (net) amount paid by final purchaser and/or consumer | $52 | $30 to $44 | $30 to $37 | $30 to $37 | $24 |

(Footnotes omitted.)

61.    *The Wall Street Journal* article stated drug manufacturers are aware of the illegal practice, but are so dependent on the big three distributors that they cannot do anything about it. The House Energy and Commerce Committee said in June 2003 that it sent Amerisource (and Cardinal Health and McKesson) requests for information on their pricing and billing as it probes possible Medicare fraud.

62.    In 1999, federal prosecutors in Las Vegas targeted Amerisource as part of a broad investigation of illegal drug diversion in the Southwest.  Working with Fred Evans, a two-time felon, the FBI set up an undercover business known as V.N. Chicago Inc. ("V.N.") in Las Vegas. In seven months, V.N. bought $ 31.2 million worth of deeply discounted drugs meant for hospices and nursing homes from the Sacramento division of Amerisource. V.N. quickly diverted the drugs to other smaller wholesalers, earning nearly $ 1 million in profit.  In July 2003, the U.S. Attorney in Sacramento charged Robert Strusz ("Strusz"), a sales manager at Amerisource's Sacramento distribution center, with a single federal criminal count of mail fraud.  Strusz pleaded guilty in September 2003 and is cooperating with investigators.  Strusz had worked closely with Evans to arrange the sale of the discounted drugs to V.N. while employed by Amerisource.

63.     Strusz pled guilty to receiving kickbacks in a scheme in which Amerisource sold drugs to institutional pharmacies in excess of their needs, with the drugs then being diverted illegally to the secondary wholesale market.  According to the Criminal Information filed by the Government, drug manufacturers are allowed sell pharmaceuticals to institutional pharmacies at substantially discounted prices.  To protect the sales markets for the manufacturers, all sales contracts with institutional pharmacies include "own and use" clauses which require the institutional pharmacy to represent that all of the drugs being purchased at the deep discounts are only going to be provided to patients in institutional settings *at penalty of being banned from the preferential pricing structure*.

64.     The government's Information reveals that in order to obtain "bonuses and promotions based on his ability to increase sales for Amerisource," Strusz often sold drugs from Amerisource "to individuals who he knew were going to divert the drugs from 'own use' pharmacies to the regular commercial market."  The Information also reveals that "[b]ecause of an increase in orders received by Amerisource as a result of [the Amerisource sales manager's] actions, he was promised additional bonuses and promotions from Amerisource."

65.     Under the terms of his plea agreement, Strusz agreed to "cooperate fully and completely" with the government in any future grand jury or trial proceeding against Amerisource or any of its executives which exposes Amerisource to a threat of prosecution and liability.  The threat against Amerisource is real.  In 2000, Bindley Western (acquired by Cardinal Health in 2001) pleaded guilty to one count of conspiracy and paid a $20 million fine in a federal fraud case involving allegations nearly identical to those now being made against Amerisource.  Two former Bindley Western vice presidents knowingly sold pharmaceuticals to institutional pharmacy customers who planned on reselling the product at a profit in the secondary market.  Bindley Western ultimately paid $20 million.

66.     On November 19, 2003, the Company announced that the U.S. Attorney's Office in Sacramento, California, was requesting more information on the transactions underlying the Strusz conviction, including background into the Company's Sacramento operations during the late 1990s.  Defendants have acknowledged that the Amerisource customer in question was under contract with Amerisource to buy medication at a lower price from the manufacturer.

**DEFENDANTS' MISAPPROPRIATION OF PROPRIETARY INFORMATION**

67.     Applicable securities laws and SEC regulations require that insiders in possession of material non-public corporate information either disclose such information or abstain from trading, even where they otherwise have no other legal obligation to disclose the information. Between February 2001 (when defendants acknowledge the FBI notified them that it was investigating Amerisource's drug sales and rebate activity as far back as 1999 in conjunction with the FBI sting operation), and September 19, 2003 (when Strusz plead guilty to mail fraud and Amerisource's stock plummeted to below $55 per share), defendants Martini, Yost, Brady, Hagenlocker, Rodgers, Collis, Carpenter and Dimick usurped adverse internal Amerisource data to dispose of significant amounts of stock without disclosing the Company's material, non-public proprietary information.  During that time period, Amerisource's stock traded up from between $48 and $56 per share in February 2001, to above $80 in 2002 and above $70 in 2003, before plummeting to below $54 per share on the September 19, 2003 news of Strusz' guilty plea in exchange for his promise to assist in the prosecution of Amerisource.  While the price of Amerisource's stock was artificially inflated, defendants disposed of the following shares of Company stock in breach of their fiduciary duties to Amerisource:

| NAME | DATE OF SALE | NUMBER OF SHARES SOLD | PRICE | TOTAL PROCEEDS |
|---|---|---|---|---|
| Yost | 09/5/01 | 28,000 | $65 | $1,811,600 |
| Dimick | 10/1/01 | 34,732 | $71 | $2,446,866 |
| Brady | 11/14/01 | 971 | $56 | $54,395 |
| Rodgers | 12/6/01 | 971 | $60 | $58,377 |
| Dimick | 02/1/02-02/21/02 | 81,952 | $65 | $5,301,081 |
| Collis | 04/30/02 | 14,000 | $77 | $1,084,580 |
| Brady | 05/1/02 | 10,000 | $76 | $761,153 |
| Hagenlocker | 05/6/02 | 8,000 | $76 | $606,400 |
| Martini | 05/8/02-05/13/02 | 114,395 | $76 | $8,737,812 |
| Collis | 06/28/02 | 5,903 | $77 | $454,531 |
| Carpenter | 09/6/02 | 42,769 | $73 | $3,112,865 |
| Brady | 11/8/02 | 971 | $68 | $65,853 |
| Rodgers | 11/21/02 | 971 | $58 | $56,561 |
| Carpenter | 03/13/03 | 122,797 | $69 | $8,494,138 |
| Collis | 05/27/03 | 13,000 | $59 | $766,533 |
| Collis | 06/6/03 | 14,734 | $70 | $1,029,391 |
| Martini | 06/20/03 | 10,000 | $71 | $705,000 |
| *Total* | | *504,166* | | *$35,547,135* |

68.     By engaging in, or permitting others to sell stock while in possession of material, non-public information and misappropriation of corporate information, all defendants breached their fiduciary duties to Amerisource and wasted millions of dollars of valuable Company assets, by, *inter alia*, knowingly, willfully, and/or intentionally:

(a)     failing to supervise adequately the employees and officers of Amerisource and failing to ensure that they act with honesty and integrity in order to preserve and enhance Amerisource's reputation in the business community;

(b)     failing to institute legal action against those responsible for engaging in the deceptive practices in violation of state and federal securities laws and thereby exposing Amerisource to potential liability and other financial injury resulting therefrom; and

(c)      causing Amerisource to present information to the investment community which was materially false and misleading and failing to disclose adverse information about, *inter alia*, the Company's true operational conditions and business prospects.

69.      Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Amerisource, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Amerisource and the financial benefits that flow therefrom.

70.      Defendants have made no effort to seek recovery of these illegal insider trading proceeds.  Nor have they put in place policies to prevent future recurrences of insider trading. Besides having usurped corporate opportunities that rightfully belonged to Amerisource and its shareholders and not to its faithless fiduciaries, these Amerisource officers and directors have permanently damaged Amerisource's goodwill and standing in the business community by these acts and contributed to Amerisource's loss of the VA contract.

**DEFENDANTS' MISCONDUCT COST THE COMPANY'S ITS LUCRATIVE VETERANS ADMINISTRATION CONTRACT**

71.      Until December 31, 2003, Amerisource's largest customer was the VA, but that $25 million contract came up for renewal in the Fall of 2003 at the same time the news of Amerisource's complicity in the counterfeit drug distribution and money laundering schemes was coming out.  During the Summer of 2003, the VA solicited proposals for this $3 billion annual eight-year pharmaceutical prime vendor program starting in April 2004.  Pursuant to Subpart 803.70 of the VA's Acquisition Regulation, to receive a VA contract renewal, defendants knew contractors doing business with the VA had to "avoid improper business practices" which Amerisource, under their hands, clearly did not do:

803.7000   Policy.

It is the Department of Veterans Affairs' (VA) policy to contract with companies that conduct business with the highest degree of integrity and honesty. To demonstrate this commitment to integrity and honesty, contractors should have standards of conduct and internal control systems that are designed to promote such standards, to facilitate the timely discovery and disclosure of improper conduct in connection with Government contracts, and to assure that corrective measures are promptly instituted and carried out.   For example, a contractors system of management controls should provide for--

(a)      A written code of business ethics and standards of conduct and an ethics training program for all employees;

(b)      A mechanism, such as a hotline, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports;

(c)      Disciplinary action for improper conduct;

(d)      Periodic reviews of company business practices, procedures, policies, and internal controls for compliance with standards of conduct and the special requirements of Government contracting;

(e)      Internal and/or external audits as appropriate;

(f)      Timely reporting to appropriate Government officials of any suspected or possible violations of law in connection with Government contracts or any other irregularities in connection with such contracts; and

(g)      Full cooperation with any Government agencies responsible for either investigation or corrective actions.

72.      Because Amerisource's largest customer was the VA, defendants were under an increased duty to avoid even the appearance of an impropriety.   Instead of providing better oversight and policies concerning Amerisource's transactions with the secondary market, defendants kept the fact that they were being investigated by the FBI and FDA for possible fraud allegations hidden from the public and from investors until Strusz's plea agreement was announced on September 19, 2003.  Defendants' characterization of the ongoing FBI investigation as "old news" in connection with the September 19, 2003 announcement was especially troubling since this news had been concealed from the investing public for two-and-a-half years.   Moreover,

defendants' aspersions that the Company's transactions with the secondary wholesale market were minimal were substantially undercut by the fact that as recently as May 2002 the Company was purchasing and distributing to highly sensitive patients prescription Epogen with a dangerously low efficacy levels.  Due to defendants' misconduct, the Company's credibility and reputation in the medical community have been greatly damaged and Amerisource has lost the $25 million VA contract, its single largest customer, and will likely lose its standing as the largest U.S. drug wholesaler.  Defendants have also cut the Company's fiscal 2003 earnings estimates by $0.40 due to the loss of the VA contract.

**AIDING AND ABETTING AND CONCERTED ACTION**

73.     In committing the wrongful acts alleged herein, the defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the defendants further aided and abetted and/or assisted each other in breach of their respective duties as alleged herein.

74.     During all times relevant hereto, the defendants collectively and individually initiated a course of conduct which was designed to and did maintain the Director Defendants' executive and directorial positions at Amerisource and the profits, power and prestige which the Director Defendants enjoyed as a result of these positions.  In furtherance of this plan, conspiracy and course of conduct, the defendants collectively and individually took the actions set forth herein.

75.     The purpose and effect of the defendants' common enterprise and/or common course of conduct was, among other things, to disguise the defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control and gross mismanagement so they could protect and enhance their executive and directorial positions and the substantial compensation and

- 37 -

prestige they obtained thereby and to permit the Selling Defendants to sell over $35 million worth of Amerisource stock while in possession of material, non-public information.

76.    The defendants accomplished their common enterprise and/or common course of conduct by abusing their control over Amerisource. Each of the defendants was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained of herein.

77.    Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.    Plaintiff brings this action derivatively in the right and for the benefit of Amerisource to redress injuries suffered and to be suffered by Amerisource as a direct result of the breaches of fiduciary duty, violations of law, abuse of control and gross mismanagement, as well as the aiding and abetting thereof, by the defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

79.    Plaintiff will adequately and fairly represent the interests of Amerisource and its shareholders in enforcing and prosecuting its rights.

80.    Plaintiff is an owner of Amerisource stock and was an owner of Amerisource stock at the times relevant to the defendants' illegal and wrongful course of conduct alleged herein.

81.    As a result of the facts set forth throughout this complaint, and additionally pursuant to Delaware law, which governs Amerisource's internal affairs, demand on the Amerisource Board of Directors to institute this action against the officers and the members of the Amerisource Board

of Directors is not necessary because such a demand would be a futile and useless act, particularly for the following reasons:

(a)     The directors of Amerisource participated in, approved and permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Amerisource's stockholders and are therefore not disinterested parties;

(b)     Amerisource's Board has been dominated and controlled by Yost and Martini. Eight of the ten Amerisource directors have served together for decades as directors and/or officers of Amerisource.

(c)     Until recently, Amerisource had no nominating committee.  As a result, all Board nominations and committee assignments, and thus Board composition and governance issues, were controlled directly or indirectly by Yost and Martini.

(d)     By refusing to turn important corporate governance issues over to an independent board committee, Amerisource's Board has continued to cause the Company to confer benefits on themselves that damage Amerisource and its shareholders.

(e)     The Board's Executive Committee, which exercises the Board's power when it is not sitting, has been dominated by Yost and Martini.

(f)     In order to bring this suit, all of the directors of Amerisource would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

(g)     The acts complained of constitute violations of applicable law and the fiduciary duties owed by Amerisource's officers and directors and these acts are incapable of ratification.

(h)     Any suit by the directors of Amerisource to remedy these wrongs would expose the Director Defendants and Amerisource to further actions for breach of fiduciary duty

which could result in civil actions being filed against one or more of the Director Defendants – *or criminal sanctions as several state and federal criminal investigations are currently underway* -- thus, the Board is hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(i)     Each Director Defendant is the recipient of significant remuneration paid by the Company, the continuation of which is dependent upon their continued cooperation with the other members of the Board of Directors, and their participation and acquiescence in the wrongdoing set forth herein.

(j)     Amerisource's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance policies which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Amerisource.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Amerisource against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Amerisource, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(k)     Due to their longstanding association as directors of the Company, their positions as present or former employees, and their extensive, long-standing personal, professional, and familial relationships, as alleged herein at ¶¶15-24, the Director Defendants are so dominated

and controlled so as not to be capable of exercising independent objective judgment of the allegations contained herein.

82.     Plaintiff has not made any demand on shareholders of Amerisource to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Amerisource is a publicly traded company with approximately 112 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## FIRST CLAIM FOR RELIEF

### Derivative Claim for Breach of Fiduciary Duty
### Against All Defendants

83.     Plaintiff incorporates by reference and realleges each and every allegation contained in this complaint as though fully set forth herein.

84.     Each defendant knowingly, willfully, and/or intentionally violated and/or caused Amerisource to violate state and federal laws and regulations.  As officers and/or directors of a publicly held company, defendants had a duty to put the interests of Amerisource above their own interests.

85.     As a result of defendants' malfeasance, Amerisource has had its reputation in the sensitive drug distribution industry and the business community tarnished and has been severely damaged.  Amerisource has suffered and will continue to suffer damages for violating state and federal laws and endangering the health of millions of Americans.  Amerisource's reputation and goodwill have been harmed and it has lost the VA contract and its earnings have been slashed.

86.     By reason of the foregoing, Amerisource has been damaged and has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law.

### SECOND CLAIM FOR RELIEF

### Derivative Claim for Abuse of Control
### Against All Defendants

87.     Plaintiff incorporates by reference and realleges each and every allegation contained in this complaint as though fully set forth herein.

88.     As directors and/or officers of Amerisource, defendants controlled Amerisource. The defendants have used the control over the operations and finances of Amerisource for their own benefit and/or in disregard of their obligations of good faith, due care and loyalty for which they are legally responsible to Amerisource.

89.     By reason of the foregoing, Amerisource has been damaged and has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### Derivative Claim for Gross Mismanagement
### Against All Defendants

90.     Plaintiff incorporates by reference and realleges each and every allegation contained in this complaint as though fully set forth herein.

91.     By their actions alleged herein defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Amerisource in a manner consistent with the operations of a publicly held corporation.

92.     As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, Amerisource has sustained significant damages in excess of hundreds of millions of dollars.

93.     By reason of the foregoing, Amerisource has been damaged and has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### Derivative Claim for Waste of Corporate Assets
### Against the Director Defendants

94.     Plaintiff incorporates by reference and realleges each and every allegation contained in this complaint as though fully set forth herein.

95.     By failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Director Defendants have caused Amerisource to waste valuable corporate assets by incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

96.     By reason of the foregoing, Amerisource has been damaged and has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### Derivative Claim for Unjust Enrichment Against Defendants
### Martini, Yost, Hagenlocker, Rodgers, Collis, Carpenter and Dimick

97.     Plaintiff incorporates by reference and realleges each and every allegation contained in this complaint as though fully set forth herein.

98.     By receiving excessive compensation and selling stock while in possession of material, non-public information in breach of their fiduciary duties and usurping Amerisource's corporate assets, the defendants who received excessive compensation as alleged herein and the Selling Defendants were unjustly enriched at the expense of Amerisource and/or have aided and abetted the unjust enrichment of the remaining Individual Defendants.

99.     Defendants should be required to disgorge the gains which they will obtain or have unjustly obtained at the expense of Amerisource.   A constructive trust for the benefit of Amerisource and its shareholders should be imposed thereon.

100.    As a direct result of the defendants' misconduct and failure to oversee, and Amerisource's defective disclosure procedures, Amerisource has suffered and will continue to suffer damage to its reputation and goodwill.

### SIXTH CLAIM FOR RELIEF

### Usurpation of Corporate Opportunity Against the Selling Defendants

101.    Plaintiff incorporates by reference and realleges each and every allegation contained in this Complaint as though fully set forth herein.

102.    Each of the Selling Defendants, defined herein at ¶28, controlled Amerisource and was provided with the Company's proprietary, non-public information concerning the FBI investigation into the Company's drug sales and related rebate transactions.   The Selling Defendants engaged in conduct which breached their fiduciary duties to Amerisource by deliberately usurping corporate opportunities from Amerisource via the use of confidential Amerisource information for their own personal benefit.

103.    By reason of the foregoing conduct, the Selling Defendants usurped Amerisource's opportunities and have damaged Amerisource.

104.    Plaintiff, as a shareholder representative of Amerisource, seeks damages for Amerisource.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, including preliminary and permanent injunctive relief, as follows:

A.     Awarding restitution, compensatory and punitive damages on behalf of Amerisource against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of any benefits accruing to defendants by virtue of their illegal acts or their other assets, so as to assure that plaintiff and Amerisource have an effective remedy;

C.     Disgorgement of defendants' illicit compensation and insider trading proceeds and immediate repayment of defendants' illicit loans with interest;

D.     Awarding plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  March 5, 2004                    LAW OFFICES
                                          BERNARD M. GROSS, P.C.
                                          BY:

Case 2:04-cv-00972-WY   Document 1   Filed 03/05/04   Page 47 of 48

---

DEBORAH R. GROSS

1515 Locust Street, 2nd Floor
Philadelphia, PA  19102
Telephone:  215/561-3600
215/561-3000 (fax)

MILBERG WEISS BERSHAD
   HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINSMARY K. BLASY
401 B Street, Suite 1700
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

G:\Sec\AMERISOURCE\LEGAL\cplt.doc

<u>VERIFICATION</u>

I, Deborah R. Gross. by declare as follows:

105.    I am a member of the law firm of Law Offices Bernard M. Gross, P.C., one of the counsel for plaintiffs in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

106.    I make this Verification because plaintiffs are absent from the County of Philadelphia where I maintain my office.

Executed this 5th day of March, 2004, at Philadelphia, Pennsylvania.


_____
DEBORAH R. GROSS

G:\Sec\AMERISOURCE\LEGAL\cplt.doc

- 1 -